UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>   Plaintiff,<br><br>vs.<br><br>VONTINO ALEXANDER,<br><br>   Defendant. | Case No.: 12-CR-00118-YGR<br><br>**ORDER GRANTING MOTION TO SUPPRESS EVIDENCE** |

On January 31, 2013 and February 12, 2013, the Court held an evidentiary hearing on Defendant's Motion to Suppress Evidence stemming from a warrantless search of 5471 Foothill Boulevard, Apartment 4, Oakland, California ("the Apartment"). (Dkt. No. 15.) Defendant Vontino Alexander filed a Summary of Evidentiary Hearing, Statement of Law and Argument on March 1, 2013. (Dkt. No. 41.) The United States filed a Post-Hearing Brief in Opposition to Motion to Suppress Evidence on March 2, 2013. (Dkt. No. 42.)

Defendant Alexander sought to suppress all evidence obtained from the Apartment on two grounds: First, the defendant argued the police did not have probable cause to believe the Apartment was his residence and, therefore, probable cause to conduct a parole search did not exist. Second, the defendant argued that Rochelle Valentine, who did live at the Apartment, did not voluntarily consent to the search.

Having carefully considered the papers submitted, the testimony of the witnesses, and the argument of counsel, for the reasons set forth below, the Court **FINDS** that the police did not have probable cause to conduct a parole search. The Court further **FINDS** that the police did obtain the voluntary, written consent of Valentine. However, because the consent to search was not obtained *prior* to entering the Apartment, the Motion to Suppress is **GRANTED**.

## I. FACTUAL BACKGROUND AND INITIAL FINDINGS.

The Court makes the following findings of fact which are not materially in dispute:

1. The search at issue occurred on Thursday, February 16, 2012 during daytime hours.
2. The Apartment is located on the bottom level of a two-story building which appears similar to a traditional motel. The top level has an outside exterior walkway supported by a railing. The front door to each of the units on the bottom level is accessed by walking up two steps to a square landing. (Exh. 6.) The landing is only marginally wider than the front door. The parties refer to this landing as a "front porch." The Apartment has a wooden front door and an outer white metal security gate. (Exhs. F, G.)
3. The property recovered included in pertinent part:
   a. One Glock Model 21, .45 caliber, semi-automatic, black in color handgun, serial #EBP389 and ammunition;
   b. Fifty-one (51) individual plastic bags containing suspected marijuana;
   c. A scale; and
   d. A black and red Metro PCD cell phone.
4. The Apartment is not the parole address for the defendant. The parole address of record is 893 70th Avenue, Oakland, California.
5. Oakland Police Officer Anthony Tedesco personally witnessed a man he later determined to be the defendant quickly enter the Apartment on February 15, 2012 at approximately 10:00 p.m. The defendant had been standing next to a silver-colored Hyundai SUV.
6. The defendant entered the Apartment without a key.
7. Officer Tedesco had had no prior contact with the defendant.
8. Through records checks, Officer Tedesco linked the silver-colored Hyundai SUV to Rochelle Valentine, the registered owner. He then linked Valentine to defendant Alexander because records showed that Valentine had visited defendant Alexander in the Alameda County jail.

9. No evidence exists showing the defendant had any contact with the Apartment prior to February 15, 2012.
10. The defendant's address on his California Driver's License is on 70th Avenue in Oakland, California.
11. Officer Tedesco's records check of the defendant indicated that he was on parole with a search condition.
12. The next day, on February 16, 2012, at approximately 11:50 a.m., Officer Tedesco personally witnessed the defendant enter the Apartment without a key or knocking, exit the Apartment approximately five minutes later, and conduct what the officer believed to be a hand-to-hand sale of marijuana for an unknown amount of money. The defendant then drove away in the Hyundai SUV.
13. Valentine lived at the Apartment.
14. After the Hyundai SUV drove away, Officer Tedesco contacted Oakland Police Officer Daniel Bruce to stop the vehicle and to conduct a parole search of the Apartment on the basis of the defendant's parole status.
15. Officers stopped the Hyundai SUV and recovered a set of keys.
16. Oakland Police Officers Daniel Bruce, Anwan Jones, and Billy Matthews were the first to arrive at the Apartment and interact with Valentine.
17. The officers approached the Apartment with guns drawn but not pointed directly at anyone in particular.
18. Valentine told the officers she lived at the Apartment.
19. Valentine told the officers that defendant Alexander was her fiancé and she was pregnant with his child.
20. Valentine told the officers that the defendant stayed there sometimes.
21. Officer Matthews used the keys recovered from the defendant and verified that the house key opened the Apartment door.
22. The officers noticed a second woman, later identified as Akoshiana Stewart.

23. Officer Jones read the formal Consent to Search form to Valentine while inside the Apartment.

24. Valentine signed the Consent to Search Form. The form indicated that Valentine stated she didn't "have a problem with it." Officer Jones co-signed the form, dated it, and indicated the time of signing to be 12:24 p.m.

25. The Consent to Search Form includes the following pre-printed sentence: "I have been told that I have a right to refuse to allow the police to search my person or my property."

26. The officers conducted a full search of the Apartment after obtaining the written Consent to Search Form.

27. The evidence at issue resulted from the full search of the Apartment.

28. Officer Matthews hand wrote Valentine's statement based upon what she told him. Corrections were made and initialed. The statement indicates that the process began at 12:34 p.m. and ended at 1:04 p.m.

29. The statement form includes a pre-printed Miranda warning.

30. When Officer Tedesco arrived at the Apartment, he saw Officer Matthews seated at the kitchen table with Valentine and Stewart sleeping on the couch in the Apartment.

31. Stewart did not testify.

Notwithstanding the written Consent to Search Form, the parties dispute the facts relative to the initial encounter between Valentine and the Officers and whether consent was freely given to search the Apartment. With respect to these facts, the Court first reviews the testimony of each and then discusses them in the context of the legal standards relevant to the pending motion.

**A.     Valentine's Version:**

Valentine claims that the officers did not ask, nor did she give consent, to enter and search her Apartment. (RT 134:8-10.) In a declaration leading to the evidentiary hearing in this matter, Valentine attested:

> I was speaking with police officers while holding open the outer security door to my apartment. I did not give any officers permission to enter my apartment, and tried to close the outer security door. One of the officers wedged his foot between

> the security door and the door frame, which prevented me from closing the security door completely. The officer had drawn his gun and told me that if I refused to allow him to conduct a search that I would be going to jail with Vontino Alexander. Officers then entered my apartment and began to search it.

(Valentine Declaration ¶ 3, Dkt. No. 17-1.) During the evidentiary hearing, Valentine testified that she saw officers outside approaching her apartment and went to her security door "getting ready to walk out." (RT 131:19-20.) While standing in the door step of her door, she saw the officers pointing their weapons "off to the side" in her direction. (RT 132:11-16.) The officers told her they were there to do a parole search, to step outside, and if she didn't, she would be arrested. (RT 134:12-10-13.) She also claimed that she was standing at the stoop of her door trying to shut the security gate when one of the officers put his foot in the way stopping her from closing the door. (RT 13-21.) During her direct examination, she testified that she had to stay outside for 30 minutes while wearing only "boy shorts and a tank top." (RT 14-24.) She said she was told she "had to sign the form so that [she] would not get in the way of the parole search." (RT 16-17.) She also confronted the officers stating Alexander "does not stay with me. He's -- I'm not on parole and you guys are in my house." (RT 136:4-5.) She did not read the statement closely. (RT 136:11-13.) She also claimed that she was "scared, historical [*sic*], shock" and was crying for "ten to fifteen minutes" while both inside and outside the Apartment. (RT 186:20-187:4.) Valentine later seemed to suggest that she waited outside for only ten to fifteen minutes. (RT 188:3-6.)

**B.      Government's Version:**

The Officers' versions are not perfectly consistent but also do not corroborate Valentine's claim that her signature on the Consent to Search Form was coerced. The first officers to arrive at the premises where the Apartment was located were Officers Anwan Jones, Billy Matthews, and Dan Bruce. None of the officers knew Valentine prior to this encounter. The Court reviews each officer's testimony in turn.

First, Officer Jones testified that he was at the Apartment to do a parole search. (RT 93:7-10; 79:24-80:11.) Before he arrived at the Apartment, Valentine came out and was standing "at the doorway." (RT 69:23-70:9; 84:2-5; 90:7-8.) He asked her whether the defendant lived there and she replied that he stayed there sometimes. (RT 70:14-20.) She also confirmed that she was pregnant with the defendant's child and he did have clothes in the Apartment. (RT 71:23-71:3.)

5

Jones noticed another woman was with Valentine. (RT 71:25-72:5.) When asked if anyone else was in the Apartment, Valentine said no. He specifically recalled asking whether he could check for others in the Apartment. Valentine agreed. (RT 72:13-73:19.) While Jones and others conducted the protective sweep, Valentine was required to be outside. (RT90:1-3.) Once completed, Jones and Valentine "relocated to the kitchen" and she was asked to "consent to search the entire apartment." (RT 74:1-6.) Within a minute or two of completing the protective search, Jones reviewed the Consent to Search Form with her. (RT 86:16-21; 76:1-25.) The time of signing recorded on the Form was 12:24 p.m. (Exh. 3.)

Second, Officer Matthews testified he was at the Apartment to do a parole search. (RT 95:10-14; 108:12-17; 111:1-3; Exh. C.) He testified that upon his arrival, and before he and Officer Jones made initial contact, Valentine opened her front security door and came out to speak to the officers. His testimony regarding the initial set of questions corroborates that of Officer Jones. (RT 101:4-7.) He testified that Officers Jones, Bruce, and Ruiz did the initial security check. (RT 102:13-24.) He then indicated that after the security check, Officer Jones retrieved a Consent to Search Form for Valentine and she signed. (RT 104:10-15, 23-25.) Matthews does not explain how or when he entered the house.

Next, Officer Bruce testified he was at the Apartment to do a parole search. (RT 59:22-25.) He stated that as was walking to the Apartment, he encountered Valentine walking out of the Apartment. She told him that she lived there with her fiancé Vontino, they shared a bedroom and she had two dogs in the house. (RT 47:20-48:1.) The conversation happened on the "front porch." (RT 59:12-20.) Both the security door and the front door were open. He asked the additional woman he saw inside to come outside. Bruce testified that no permission was requested or given to enter the Apartment. (RT 51:15-17.) He recalls that approximately 15 minutes later, Valentine had signed the Consent to Search Form. Bruce did not recall asking for any permission to enter the Apartment in the first instance. (RT 51:15-17.) About a minute after first encountering Valentine, Bruce did a security sweep and confirmed that no one else was inside. (RT 15-23; 60:18-63:16.) They did not do an immediate search but froze the scene and waited about 15 minutes until the Consent to Search Form was signed. Generally, he prefers to get a voluntary consent to search

6

1  because a parole search would have been limited and generally he prefers to search all areas. (RT
2  63:5-16; 64:22-65:7.)

3  Finally, Officer Tedesco testified as to his observations from a remote surveillance location.
4  Using binoculars, he was able to see the officers approach the building, a door open and a female
5  exit onto the "front porch." (RT 25:21-24.) He observed Officer Jones and Valentine talking; the
6  latter was gesturing. (RT 26:19-23.) He testified that the initial contact happened between 12:10
7  and 12:20 p.m. A few minutes after making contact, the officers radioed that the Apartment was
8  clear and Tedesco went to the Apartment himself where he saw Officer Matthews sitting at the
9  kitchen table taking Valentine's statement.

## II. LEGAL STANDARD

"The Fourth Amendment generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects." *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990).

### A. Probable Cause to Conduct a Parole Search

"The warrantless entry into [a third party's] home cannot be justified as a search for a parolee in what might have been the parolee's residence." *Cuevas v. De Roco*, 531 F.3d 726, 732 (9th Cir. 2008). Rather, "'before conducting a warrantless search pursuant to a parolee's parole condition, law enforcement officers must have probable cause to believe that the parolee is a resident of the house to be searched.'" *United States v. Howard*, 447 F.3d 1257, 1262 (9th Cir. 2006) (quoting *Motley v. Parks*, 432 F.3d 1072, 1080 (9th Cir. 2005) (*en banc*) (alteration supplied by *Howard* omitted), *overruled on other grounds by United States v. King*, 687 F.3d 1189 (9th Cir. 2012) (*en banc*)). "Requiring officers to have probable cause to believe that a parolee resides at a particular address prior to conducting a parole search protects the interest of third parties." *Motley*, 432 F.3d at 1080.

Based on the Ninth Circuit's analysis in *Howard*, four issues predominate: First, whether the police ascertained after an investigation that the defendant was residing at the place searched, rather than at the parole address on file. Second, whether the search was based on direct observations confirming that the defendant was residing in the place searched (*e.g.*, parolee seen

7

running errands, repeatedly entering or leaving over the span of multiple days, or receipt of mail at the residence searched). Third, whether the parolee had his/her own key to the residence and was seen using the same. Fourth, whether co-residents confirmed that the parolee lived there.

Here, the defendant's parole address was not the residence searched. The police had no information indicating that the defendant was not living at his parole address. Officer Tedesco did not contact the defendant's parole officer before the search of the Apartment, and nothing in any of the database searches he conducted confirmed that the Apartment was defendant's residence. Officer Tedesco only observed the defendant entering the Apartment twice. Access to a residence is insufficient to justify a parole search of the same. The police must have probable cause to believe that the location is the parolee's *residence*; presence as a guest does not suffice. *Howard*, 447 F.3d at 1265-66; *see also id.* at 1262 (information that parolee is occasional overnight guest is insufficient for probable cause to believe that parolee resides at residence); *United States v. Franklin*, 603 F.3d 652, 657 (9th Cir. 2010) (holding it is not enough for probable cause that parolee "happens to be seen there").

The facts linking the defendant to the Apartment for purposes of a parole search were wholly inadequate. None of the factors set forth were present. So lacking was the evidence that any reasonable officer who had known the basis for the parole search would have known that a search of the Apartment on the grounds of a parole search was not valid. Accordingly, the Court finds that the search of the Apartment was not justified as a parole search.

**B. Voluntary Consent to Search**

Next, the government justifies the search on the grounds that the undisputed resident, Ms. Valentine, voluntarily consented. No dispute exists that Valentino signed a written Consent to Search Form. The question is whether the signature, or authorization, was given voluntarily.

When the government seeks to rely upon consent to prove the validity of a search, it must show that the consent was given voluntarily. *Schneckloth v. Bustamonte*, 412 U.S. 218, 248-49 (1973). The Ninth Circuit analyzes five factors in this regard: first, was the consenting individual in custody? Second, did the arresting officers have their guns drawn? Third, were Miranda warnings given? Fourth, was the consenting individual notified that she had a right not to consent?

8

Fifth, was the consenting individual told that a search warrant could be obtained? *United States v. Brown*, 563 F.3d 410, 415 (9th Cir. 2010). No single factor is determinative. *Id.* All serve as guideposts. *Id.* The question is whether the will of the consenting individual was overborne. *Schneckloth,* 412 U.S. at 225-26, 248-49. However, a consenting party does not have to understand that he or she is giving up a constitutional right not to consent. *Id.* In determining whether consent is "free and voluntary" rather than the result of coercion or duress, this court also considers other factors such as whether compliance was sought versus ordered; any efforts to mislead; number of officers present; day search versus night search; and the maturity and emotional condition of the person giving consent.

The search of Valentine's residence occurred during the middle of the day. At least five officers were present on the scene. The three who initially approached the Apartment were significantly larger in size than Valentine. Each measured at least six feet weighing no less than 180 pounds while the women were no more than five feet four and 130 pounds. The officers approached with guns drawn but not directed at Valentine. Valentine was not in custody and not in handcuffs. Valentine is not a child and does not have a shy, unassuming personality. Despite her physical size, Valentine's physical presence in court and the tone and nature of the recorded conversations admitted into evidence demonstrates that Valentine is a strong woman, self-assured, opinionated, and not easily intimidated. (Exh. 13, 13A.) She appeared as comfortable on the witness stand as any of the police officers.

The Consent to Search Form itself is quite simple and is written in three languages: English, Spanish and Chinese. The completed form provided, in pertinent part:

> I consent to the search of: [in handwriting: 5471 Foothill #4]
>
> [three blank lines]
>
> I have been told that I have a right to refuse to allow the police to search my person or my property. I have given my consent voluntarily without threats or promises.

The form was signed "Rochelle Valentine" as the "Consenting Party." (Exh. 3; Exh. A.) Valentine's suggestion that she did not know what she was signing is not credible. This was a simple, unambiguous form. Valentine reads and writes English.

The proffered evidence of coercive behavior focuses on the claim that "one of the officers wedged his foot at the bottom of the door" (RT 133:20-21) and told her she would go to jail if she interfered with the parole search. The officers deny this characterization. Valentine bolsters her claim by testifying that the officers made her wait outside in the cold for thirty minutes while she was crying and pregnant.

Based upon the testimony and evidence presented at the hearing, the Court finds that Valentine's testimony is not credible. This conclusion is based upon (i) inconsistencies in her testimony, (ii) her motive to fabricate, (iii) her disposition during her testimony, (iv) the admitted impeachment evidence, and (v) the other evidence admitted at the hearing. Among the evidence supporting this conclusion, the Court notes:

- On direct examination, Valentine testified that she was crying for 10-15 minutes. As to his point, the Court finds Valentine's version highly unlikely. The pictures taken while she was sitting at the kitchen table show no evidence of crying. There is no puffiness in the cheeks, no swollen areas around the eyes and no redness. (Exh. 4.)
- On direct examination, she claimed to have been left outside for 30 minutes in the cold, then on re-cross examination, she changed the testimony to 10-15 minutes. In addition, the timing on the Consent to Search Form does not corroborate her testimony. The officers had no reason to fabricate the timing as they genuinely believed that they were conducting a legal parole search.
- Valentine demonstrated that she was willing to be less than truthful on the witness stand. She claimed not to remember any conversations with the defendant regarding his statements about their joint efforts in "knocking bitches" (RT 142:10-143:3) and of physical violence against her (RT 143:10-144:1), but long recorded telephone calls revealed the contrary (Exhs. 13, 13A, 13B). She ultimately, and reluctantly, admitted that the topics were memorable.
- On the date of the event, she was "in the middle of a breakup" which now appears to be reconciling. (RT 138:15-139:10; 176: 4-6; 177:12-178:19.) This supports the conclusion that at the time of the search Valentine had no incentive to protect the

10

defendant. (Exh. 2: "I knew there was nothing illegal in my apartment and I gave them my consent to search my apartment. . . . I do not allow illegal guns or drugs in my house.")

- Now, Valentine and the defendant are reconciling. Valentine has an incentive to keep the defendant out of custody so that he can provide moral and financial support for his daughter as he is the father of Valentine's child.
- Valentine's written statement indicates the defendant spent the night at Valentine's Apartment. Her testimony in court was opposite. There is no indication that the officers had reason to fabricate this portion of her statement which contradicts her testimony.

Similarly compelling is the lack of any of the independent evidence to corroborate Valentine's version or which would suggest that the officers created a coercive atmosphere. As mentioned, the pictures taken do not suggest that Valentine was stressed or crying. Officer Tedesco saw Ms. Stewart sleeping on the couch. Further, even though Valentine owns a pit bull for protection, which she said the dog readily provided, the pit bull did not have to be put away during the encounter, suggesting that the situation was not antagonistic towards Valentine. While the officers are physically more imposing than Valentine, that in and of itself is insufficient to show coercion.

Thus, with respect to Valentine's encounter with the police officers, the Court makes the following findings of fact:

1. Valentine herself opened her security gate to talk to the officers who were approaching her Apartment.
2. During this initial encounter, the officers' guns were drawn but not pointed at Valentine.
3. Valentine voluntarily agreed to the officers to do a protective sweep of the Apartment while she continued to talk.
4. While the protective sweep was being conducted, Valentine and Ms. Stewart were outside for a short period of time.

11

5. Immediately upon the sweep being completed, all the officers, Valentine, and Ms. Stewart returned into the Apartment.

6. The officers then froze the Apartment and did not conduct a search until Valentine had signed the Consent to Search Form.

7. The officers never pointed any gun at Valentine and she was never in custody.

8. Valentine knew the content of the form and signed it voluntarily.

9. The atmosphere was calm and non-coercive, even if potentially imposing.

Based upon the foregoing, the Court finds that Valentine voluntarily consented to the search of the Apartment.

### C. Effect of the Invalid Parole Search on the Subsequent Voluntary Consent

The Supreme Court in *Herring v. United States*, 555 U.S. 135, 144 (2009) established that the exclusionary rule should only be used where its application would serve to deter "deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." There, a defendant was arrested and evidence obtained due to a clerical error arising from an old arrest warrant. *Id.* at 137-39. Given the nature of the error, the Supreme Court held that suppression of the evidence was not warranted. Thereafter, the Ninth Circuit clarified that *Herring* was limited to "isolated police negligence" and that any good faith on the part of the officers was irrelevant. *United States v. Song Ja Cha,* 597 F.3d 995, 1004-05 (9th Cir. 2010). "Our precedent distinguishes between mistakes of fact and mistakes of law because mistakes of law can be deterred more readily than mistakes of fact." *Id*. at 1005. The question is whether "'a reasonably well trained officer would have known that the search was illegal' in light of 'all the circumstances.'" *Herring,* 555 U.S. at 145 (citing *United States v. Leon*, 468 U.S. 897, 922, n.23 (1984)).

Here, no mistakes of fact existed. Officers Jones, Matthews, and Bruce acted intentionally and deliberately. Without question, each believed that they had a right to conduct a parole search and acted accordingly. They entered the Apartment without permission (other than for a protective sweep). They never considered obtaining Valentine's consent for a complete search *before* they entered the Apartment because they believed the parole search was justified. Their subjective belief, though, is not relevant here. As discussed above, any reasonably well-trained officer would

have known that the basis for conducting the parole search of this third party's residence was wholly inadequate given the facts known at the time of the search.

Even though the officers obtained Valentine's consent before the actual search, that consent does not cure the fundamental, and significant, constitutional violation which occurred once the officers "crossed the threshold" to the Apartment itself. *See United States v. Oaxaca*, 233 F.3d 1154, 1158 (9th Cir. 2000). Rather, the consent is now tainted due to the prior illegal government action. *Id.* The evidence acquired thereafter must be suppressed.

## III. CONCLUSION

For the reasons set forth above, the Motion to Suppress is **GRANTED**.

This Order terminates Dkt. Nos. 15 and 41.

**IT IS SO ORDERED**.

Dated: April 30, 2013

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**